The State v. Ma Foo, *Appellant.*

Division Two, March 28, 1892.

1. **Criminal Law;** MAYHEM: INSTRUCTIONS. Instructions on the offense of mayhem approved.

The State v. Ma Foo.

2. ———: FLIGHT: PRESUMPTION. Flight to avoid arrest creates a presumption of guilt, but it is otherwise if it was caused by the fear of mob violence.

3. **Criminal Practice**: SEVERAL COUNTS: INSTRUCTIONS. Where an indictment contains several counts, and the evidence shows the defendant is guilty, if at all, under one particular count, the instructions are properly confined to the latter.

4. **Criminal Law**: MARRIED WOMAN: COERCION: MAYHEM. The fact that a married woman commits the offense of mayhem in the presence of her husband does not authorize her acquittal. Such presence on his part raises only a *prima facie* presumption of his coercion which is subject to rebuttal.

5. ———: ———: ———: ———. On the trial of a married woman for mayhem committed in the presence of her husband where by her own evidence she exonerated him from all participation in the offense she is not entitled to an instruction that if the husband was present the jurors must acquit on that ground, if "there was no evidence that defendant's husband disapproved of the acts of defendant, and unless that fact is established they must acquit."

*Appeal from Franklin Circuit Court.*—HON. R. HIRZELL, Judge.

AFFIRMED.

*J. E. Merryman* and *A. H. Bolte* for appellant.

(1) The court erred in giving instructions, numbered 1 and 2, as to what constitutes mayhem and the sufficiency of the testimony necessary to convict. R. S. 1889, secs. 3488–9, 3491; 1 Russell on Crimes, p. 583. (2) The court erred in giving instruction, numbered 4. *State v. Leak*, Phill. (N. C.) p. 450; 1 Russell on Crimes, p. 582–3; *State v. North*, 95 Mo. 615; *State v. Stewart*, 29 Mo. 419; *State v. Warden*, 94 Mo. 648. (3) The court erred in its instruction on defendant's flight. *State v. Brooks*, 92 Mo. 542; *State v. Griffin*, 87 Mo. 608. (4) The court erred in giving instruction, numbered 7, and in refusing to instruct in connection therewith "that there was no evidence that the

defendant's husband disapproved of the acts of the defendant, and unless that fact is established the jury should acquit the defendant." *Com. v. Churchill*, 132 Mass. 267; *Com. v. Flaherty*, 140 Mass. 454; 4 American & English Encyclopedia of Law, p. 701, and the authorities there cited; *State v. Bentz*, 11 Mo. 27; *Curd v. Dodd*, 6 Bush, 681.

*John M. Wood*, Attorney General, for the State.

(1) The court correctly declared the law in its instructions. (2) Instruction, numbered 7, correctly declares the law in relation to the defense of coverture. "It is a doctrine of the English common law, that, if a crime of minor grade be committed by a wife in company with or in the presence of her husband, it is a rebuttable presumption that she acted under his immediate coercion." Wharton's Criminal Law [9 Ed.] sec. 78; 1 Bishop's Criminal Law [7 Ed.] sec. 362; *Com. v. Uhl*, 6 Gratt. 706; *Sellers v. People*, 77 N. Y. 413; *Regina v. Torpey*, 12 Cox's Criminal Cases, 45.

GANTT, P. J.—Defendant was indicted under the name of Annie Baker. Under this name she prayed a change of venue, and, upon it being granted, she signed bond for appearance in Franklin circuit court. In the Franklin court she alleged her true name was Annie Ma Foo, and the proceedings were afterwards conducted accordingly.

She was indicted at the January term, 1891, of St. Louis criminal court, for mayhem under section 3488. The indictment was in three counts, the first two for mayhem differing only in the corrosive fluid used, and the third charged a felonious assault. At the close of the testimony the state entered a *nolle prosequi* as to the third count, and appellant was convicted upon the

second, her punishment being assessed at five years' imprisonment in the penitentiary.

After unsuccessful motions for new trial, and in arrest, she was duly sentenced in accordance with the verdict, and from this judgment she has appealed.

The testimony on behalf of the state was substantially as follows: In the city of St. Louis on the twenty-fifth day of July, A. D. 1890, appellant was engaged in a Chinese laundry on South Broadway near the corner of Anna street; she was known as Annie Baker, and was reputed to be the wife of the Chinese proprietor, to whom she had borne a child. On Anna street, around the corner from Broadway, in the same block, lived Mrs. Kelly, a widow, who had a son named Walter, eleven years of age. On the morning of that day, about ten o'clock, Walter left home to go to a relative's house on Broadway, in company with two little girls. As they reached the laundry, they stopped a moment to look into the open door, when appellant came to the door, holding her hands behind her, and exclaiming, "You will look in here, will you?" suddenly dashed the contents of a bowl into the face and upon the body of the boy. The child began to scream with pain, and was led home by some person attracted by his cries, dripping and wailing. Physicians were summoned as speedily as possible, one of them an experienced oculist, and the best known treatment adopted. The boy's eyes were both burned, apparently by some strong alkali, as also the skin of his face, his lips and one of his arms; his clothing was also discolored and corroded, and smelt of concentrated lye. The eyes ulcerated, burst and sloughed away, and the lids grew together upon the remnants of the eyeballs; the lad was never able to see from the time the liquid was thrown into his face, and is now totally and incurably blind.

After the child was taken home his mother and an older brother went to the laundry, where they saw appellant and the Chinaman.   Mrs. Kelly said to the appellant:   "What did you do that to my poor little boy for?"   To which appellant answered:   "Yes, I done it, and I will do it again if I have a chance."

There was testimony of an eye-witness that she also said she did not intend it for him, but for another boy (named Berry), adding, "I will make them keep away from my door."   The brother addressed the Chinaman, in the presence of the appellant:   "What did you do that to my brother for?" and he replied, "Me no do it, my wife do it."

Shortly afterwards appellant went out, back into an alley, crossed over the street, entered a house, went through it and a rear yard into another alley, made her way to the car stables and took a street car going up town.   She was followed by the brother, who got upon the same car.   After riding a few blocks, she got off, and he did the same, and shortly after, seeing an officer, hailed him and had her arrested.   On the way to the police station the officer had a conversation with her, in which she said it was only soap suds which she had thrown, and when told she had blinded the boy replied:   "If I did, I will do it again."

There was no testimony on the part of the state that the husband of appellant was present at the commission of the act charged, but only that he was in the laundry when the mother and brother of the injured boy came there, several minutes after the deed was done.

Upon the trial the state admitted, "for the purpose of this case," that appellant and the Chinaman, Ma Foo, were married.

Appellant, testifying in her own behalf, said: "On the twenty-fifth day of July I was ironing at the table,

my husband and I, my husband on one side of the room and I on the other; on Thursday we washed and on Friday we ironed, and I was ironing awhile and concluded to scrub the floor, and I went back to get some wash water that we used the day before, to wash the floor with. There was a great deal of starch—this Chinese starch, you know—on the front part of the wall and the door, that got on there when he was starching the things, and the door was open. When I washed the floor up I had two dippers full of the water left, and threw it on the edge of the door to wash that off, and I never saw anyone when I threw it, at the time it occurred, until this little boy cried, and said I threw it in his eyes. If I did it, I did it unintentionally; why would I want to put anyone's eyes out for? * * * The boy was never in my house, that I know of, I never saw him before. * * * I had no idea or intention in the world of throwing that water in that boy's eyes. * * * There was quite a crowd came into the house, Mr. Kelly and Mrs. Kelly. I don't remember what I said; there was such excitement, and they were making such distress, I didn't know what was said. All I recollect, Mr. Kelly said to my husband, 'If that was you, I would fix you.' * * * By reason of his making threats, and there was such a crowd outside, I thought I had better go up and see what they could do about it; and I thought I had better go away from there; that they would mob the house, or something. I had to go through the front to get out, and I went down Elm (Lami) street and she, Mrs. Kelly, was in the alley. I got on the car and it did not go, and I got on another, and on that car I was arrested. I was going to Jo Hon Yee, to tell him, and see what I should do. They were making such threats, that scared me. That was my object in going there, and no other object. There were only

two places, the front and back way. I went out the back, right by Mrs. Kelly's house. I could have gone from the house and got on a Fifth street car, but I went by Mrs. Kelly's house.

"*Q.* Where was your husband at the time the water was thrown—whatever they call it? *A.* He was ironing at one side of the room.

"*Q.* How far were you from him when you threw the water? *A.* He was ironing at the same table and never moved. The water that I threw was wash water from the day before. I had used it with my hands. I worked myself, and he did also. That was the kind of water that struck the boy."

Dr. Alt and Dr. Fulton were called. Dr. Alt gave it as his opinion from the examination made that evening, that the injury was caused by a strong alkali thrown into the boy's eyes, perhaps concentrated lye. Dr. Fulton did not analyze the fluid, but it was corrosive.

OPINION.

I. As the defendant was convicted under the second count, the instruction as to that count only is here for review.

The court charged that the assault must have been made with the intent then and there, feloniously, on purpose and of malice aforethought, to maim the boy; and that defendant in pursuance of this intent did, feloniously, on purpose, and of her malice aforethought, cast, or throw, the corrosive fluid into the eyes of the boy, and did, in this way, put out his eyes.

The court correctly defined the terms, malice, malice aforethought and "on purpose;" and correctly defined a very plain statutory offense.

II. The objection to instruction, numbered 4, is equally unfounded. The court did not assume any fact, but left the jury free to find "that the defendant

knowingly and wilfully threw some corrosive fluid into the face and eyes of Walter Kelly." If she did this, the court correctly told the jury the law presumed she intended the natural consequence of her act, and, from the intentional throwing of such a dangerous instrumentality into the eyes of a child, the jury might infer malice.

Instructions should be concise. We think this instruction submitted the state's side of the question very clearly, and is not open to the criticism made on it by defendant. Immediately following it, and in the same connection, the court charged the jury that, before they could find the defendant guilty, they must believe, beyond a reasonable doubt, that the defendant intentionally, or on purpose, *and not accidentally*, threw the fluid into the boy's eyes; and warned the jury that the law presumed her innocent, until she was proven to be guilty of the charge beyond a reasonable doubt.

The issue was submitted fairly, whether defendant intentionally or accidentally threw this corrosive substance in the child's eyes. The jury found she did it intentionally.

III. The presumption from flight was properly stated. If the jury found she fled to avoid arrest, it raised a presumption of guilt. If she fled from a mob, then no such presumption arose. *State v. Griffin*, 87 Mo. 608; *State v. Brooks*, 92 Mo. 542.

IV. The ninth instruction has been approved so often, it is useless to give either reason or authority for it.

V. There was no error in failing to instruct the jury on the offenses denounced in sections 3489, 3490, 3491, 3492.

The evidence for the state, if true, made a case of mayhem alone. The evidence for defendant, if true, entitled her to an acquittal; she was guilty of mayhem

or nothing, under the evidence in this case. The court properly confined itself to the charge in the indictment, and the offense of which there was evidence in the case.

VI. But the defendant earnestly contends that the court erred in not qualifying the seventh instruction by adding thereto these words: "There was no evidence that the defendant's husband *disapproved* of the acts of the defendant, and, unless that fact is established, the jury should acquit the defendant." And in refusing instruction, numbered 5, prayed in her behalf, to the effect that if her husband was present the jury must acquit her.

The court gave the following declaration: "7. The court instructs the jury that the evidence in this case is sufficient to show that the defendant, at the time of the alleged commission of the crime, was a married woman, and the wife of Ma Foo. Now, even though you may believe, from the evidence, that the defendant committed the crime as charged in the indictment, yet, if you further believe that she committed the crime in the presence of her husband, Ma Foo, and that he was present at the time when she threw the fluid, then the law, in the absence of other and further culpatory and explanatory evidence against the defendant herself, presumes that she acted under the immediate coercion of her husband, and, in such case, you will find the defendant not guilty. This presumption of law, however, that a wife acting in the presence of her husband is acting under his coercion, and that she is, therefore, not guilty of a crime committed in his presence, is *prima facie*, only, and may be rebutted by other proper evidence in the case. And if, in this case, you believe from all the testimony before you that the defendant was the sole acting party, and committed the crime as charged without any incitement on the part of her husband, and without

his consent, or that the defendant was the sole insti-gator of the crime, and committed the same as charged in the indictment, then you will find the defendant guilty, even though you may believe that her husband was present when she committed the act."

A married woman's responsibility for crime, com-mitted in the presence of her husband, is variously stated by the text-writers.

Blackstone, in his commentaries, book 1, page 444, says: "And in some felonies, and in some infer-ior offenses committed by her through constraint of her husband, the law excuses her; but this extends not to treason or murder." And in his fourth book he says: "And she will be guilty in the same, manner of all those crimes which, like murder, are *mala in se*, and prohib-ited by the law of nature." See also Russell on Crimes [9 Ed.] p. 34.

From a close examination and comparison of the cases and the text-writers, the general rule admitted by all seems to be, that if a wife commit any felony, with the exception of murder and treason, and perhaps some other heinous felonies, in the presence of her husband, it is presumed, *in the absence of evidence to the contrary*, that she did it under constraint by him, and is, therefore, excused. 1 Bennett's Leading Crimi-nal Cases, 81; *Commonwealth v. Neal,* 10 Mass. 152; 1 Bishop's Criminal Law, 452; *State v. Williams,* 65 N. C. 398.

But the authorities are equally agreed, that this presumption is only *prima facie*, and rebuttable. So it is said in Russell on Crimes, pages 32, 33, "But this is only the presumption of law, so that if, upon the evi-dence it clearly appear that the wife was not drawn to the offense by her husband, but that she was the prin-cipal inciter of it, she is guilty." "And if she commit a theft of her own voluntary act, or by the bare com-

mand of her husband, or be guilty of murder, treason or robbery in company with, or by coercion of, her husband, she is punishable as if she were *sole.*" And this is the doctrine of all the states in the United States. 1 Wharton on Criminal Law, sec. 79; *Seiler v. People*, 77 N. Y. 411; *Tabler v. State*, 34 Ohio St. 127; *Uhl's Case*, 6 Gratt. 706; *State v. Williams*, 65 N. C. 398; *Miller v. State*, 25 Wis. 384.

In Arkansas, by force of a statute, the presence of the husband merely is no defense to the wife, unless it "appear from the circumstances in the case, that violence, threats, commands or coercion were used." *Freel v. State*, 21 Ark. 212.

It will be observed that learned counsel for defendant desire us to ingraft an additional modification on this rule of evidence, and require the state to go further, and prove that the husband not only was not the inciter or responsible criminal agent in the commission of the crime, but that he actually *disapproved* it, and, in the absence of evidence of his disapproval, the wife must be acquitted. This is not the law. There is little in the present organization of society upon which the *prima facie* presumption itself can stand, and certainly nothing calling for any extension of the presumption.

The statutory rule in Arkansas, *supra*, is more in accord with the spirit of the age in which we live. In New York, by the penal code of 1881, sections 17 and 24, the presumption is entirely abolished.

In this case, if the wife is guilty at all, she, alone, committed the criminal act, which forever deprived the boy of his eyesight. By her own evidence she exonerates her husband of all complicity in the crime. There is not a semblance of constraint. Her responsibility was fairly submitted to the jury. The instruction gave

her the full benefit of the presumption, and the jury must have found that she was neither coerced or constrained by act, deed or word of her husband to do what she did, but that she acted from her own free will. Had the act resulted in death, under the common-law authorities she would not have been entitled to the benefit of the presumption of constraint.

What difference there is in principle between the culpability of one who, on purpose and of malice aforethought, destroys the sight of a little child, and one who kills, we leave to others to state. We confess we are unable to formulate any. The defendant has been fairly tried, and the jury have convicted her. This was their peculiar province. We can but regret for the sake of humanity that she could not have been shown innocent of the charge. At this distance, it is hard, to conceive of such a crime by a woman, and that woman a mother, with so little provocation or motive.

The remarks of Mr. Harvey did not transcend the bounds of legitimate argument. He expressly subordinated his own views of the law to those expressed by the court in its instructions.

Finding no error in the record the judgment is affirmed. All concur.